ANNIE E. PECK v. CLARENCE E. PECK. [1]

*Divorce—Extreme cruelty—Accounting for property of wife.*

1. On a review of the testimony, the Court held that the charges of extreme cruelty in complainant's bill were not proved.

2. A suit for divorce is not a proper proceeding in which to secure an accounting for the wife's property which does not relate to or grow out of the marriage relation, but was her *separate* estate, and subject to her sole control. *Uhl v. Uhl*, 52 Cal. 250.

Appeal from superior court of Grand Rapids. (Parrish, J.) Argued June 9, 1887. Decided July 7, 1887.

Bill for a divorce and an accounting. Decree dismissing bill, without prejudice, affirmed. The facts are stated in the opinion.

*Maher & Felker*, for complainant.
*Edwin F. Uhl*, for defendant.

MORSE, J. On the fifteenth day of January, 1886, the complainant filed her bill of complaint in the superior court of Grand Rapids, in chancery, against the defendant, Clarence E. Peck, for a twofold purpose:

1. She prayed for a divorce upon the ground of cruelty.

2. She asked for an injunction to restrain said defendant from disposing of certain notes which she claimed belonged to her, and that a receiver might be appointed to take charge of such notes, and collect the same, and the defendant ordered to assign and deliver them to such receiver; and further prayed that the proceeds of said notes, when collected, be decreed to belong to her, and to be paid over to her by such receiver.

March 9, 1886, the supplemental bill was filed, in which it was further alleged that, since the filing of the original bill, the defendant Peck had by a quitclaim deed transferred to

[1] See *Peck v. Uhl, Post*, 592

the defendant Uhl, who is one of his solicitors in the original cause, certain lands in the territory of Dakota, which lands were purchased with the money of complainant, and in equity belong to her. She also averred that said Uhl had full notice that said lands were bought with complainant's money, and that they equitably belonged to her, and not to Peck, and that to her knowledge and belief the said Uhl paid no valuable consideration for his deed of the premises. She prays that these lands may be decreed to her free and clear of all incumbrances, and said defendant Uhl declared to hold said premises in trust for her, and ordered to convey the same to her. A prayer for a temporary injunction and for general relief was contained in both bills.

Answers were filed in both cases by the defendants therein, denying the material allegations of the bills of complaint.

Upon issue joined by replications, testimony was taken, and the causes heard upon pleadings and proofs. Both bills were dismissed without costs and without prejudice. The complainant appealed in both cases, and they were heard together in this Court.

Annie E. Peck, at the time of her marriage, was an orphan and presumed heir to about $10,000. Her home was at Troy, New York, where she was residing with some of her relatives. While on a visit to her sister, at Port Byron, in the same state, she became acquainted with the defendant Peck, and in September, 1876, they were secretly married at Mottville, New York. The week after she was married, she came to Grass Lake, Jackson county, in this State, and remained with her married sister, a Mrs. Dwelle, until March, 1877. While she was at Grass Lake, her brother-in-law at Port Byron found out her marriage, and wrote to Mrs. Dwelle in relation to the matter, which letter was read or shown to complainant. The letter stated that Peck had boasted that he had "won ten thousand dollars."

The parties soon after commenced living together as hus-

band and wife. Peck obtained employment in January, 1878, as a book-keeper in Auburn, New York, where they resided and kept house until in the spring of 1879. They then removed to Grass Lake, where they lived until 1883. During this time, Peck was engaged in farming until some time in 1880, and subsequently was a book-keeper for Smith & Shelly. While at Grass Lake they kept house, and a child, a girl, was born to them there in May, 1881. In 1883 they removed from Grass Lake to Grand Rapids, where they kept house until May, 1885. Afterwards they boarded. On arriving at Grand Rapids, Peck went into the employ of William A. Berkey as salesman, where he has ever since remained and now is.

We are satisfied that no cause was made by the proofs for a divorce. Although a "runaway match," it seems to have been in the main a happy one until the parties broke up house-keeping and went to boarding. As it is, the wife's money seems to be the whole cause of the trouble between the parties. As she received it in different installments, she placed it unreservedly in the hands and control of her husband for use and investment.

The defendant has been a hard-working and industrious man since his marriage, as shown in this record ; but he has been a simple clerk or accountant with comparatively a small salary. It is clear that neither of them was content to live in a style that could be supported by the avails of his labor, and the complainant was not backward in making the expenses which have eaten into her patrimony. The testimony shows that he has been an unusually kind and indulgent husband, and with one exception, which will be noticed hereafter, has shown no ill temper in any way. If these parties had married without money, or hope of any, except as it was earned by their joint industry and economy, they would without doubt have been now living happily together. Her inheritance has been a curse to both of them.

The specific charges of cruelty are:

1. That four days after the birth of their daughter, and while complainant was dangerously ill, the defendant went away on a pleasure excursion, and remained absent for nearly a week, leaving her in the care of hired servants.

2. By fault-finding, scolding, and criticism of the complainant, since the birth of said child, he has kept her in a continual state of dread and nervous prostration,—she being naturally weak and delicate, and with a hereditary tendency to consumption.

3. On or about November 20, 1885, he cursed and swore at her, without any just cause or provocation. She informed him that she could not live with him if he continued to treat her in such manner. Defendant then told her that he had all her money in his possession and proposed to keep it. He told her that she could go to the devil, and he would take the child and keep it away from her.

Neither of these allegations are supported by the proofs. It is true that defendant went to Detroit soon after his wife's confinement, but it appears that he went there at first on business to meet his wife's brother, and was persuaded to stay longer than he intended. The complainant was not dangerously ill whi e he was away, and ha-l the services of a competent nurse, besides a servant girl. Her sister also lived a few rods from her. This complaint of ill treatment seems to have been an after-thought.

Outside of the wife's testimony the proofs completely refute the second charge, and she herself admits that most of the times when she was nervous and irritable her husband was kind and forbearing.

The third complaint has perhaps some truth in it; but we are not disposed to put the whole blame of the transaction upon the defendant. While they were boarding, and after the money had made some trouble between them, the little girl had been permitted by the mother to make an afternoon visit with the family of Dr. Robinson, who boarded at the same place with the Pecks. When the defendant came home to supper, he found his wife had gone into the dining-room without waiting for the return of the child. The child soon

came with Mrs. Robinson, but was not in a proper condition to appear at the table. The defendant had Mrs. Robinson go to his room, and fit the child for supper, by combing her hair and changing some of her clothing. When the complainant came out from supper, defendant spoke to her, and asked her if she could not have waited a few minutes, and taken care of Winnie (the little girl). She made some remark to him, saying: "Don't you like it?" or something to that effect. He testifies that he said "he didn't a d——d bit." Complainant swears that he said "My God! this makes me hot." It is apparent, and admitted by both of them, that neither was in the best of humor, and some hard words passed between them. Very soon after this she went to the store where he was working, and demanded the securities representing her money, and he delivered to her all he had, except two notes. She then separated from him.

During a married life of nearly 10 years this is the only time that it is established that he ever spoke unkindly to her. She spent considerable time traveling, and was much away from her husband. She went east in 1884, and was away from home from May until September. In November of the same year she went to Boston, and was gone about a month. In 1885 she was absent from June until September. Her husband made no objection to her being away. It would appear that she has in some measure lost her affection for her husband, and it is not by any means certain that he is in fault or to blame for it.

There is no charge of drunkenness on defendant's part in the bill, and the attempt to show it in the proofs was a failure. Neither is there any foundation in the record for complainant's attempted insinuations that he had abused his martial privileges to her discomfort and ill health. On the contrary, it is shown by her own testimony that his embraces had become exceedingly distasteful to her at any and all times.

It is very clear that complainant is adverse to continuing the marital relations with defendant. She not only does not love him, but cannot abide his presence. It is not desirable, under the circumstances, that they should be bound together by a tie that is hateful and irksome to one of them. But we cannot dissolve the marriage without reason. Much less can we release the complainant from the bonds of matrimony for no cause but her own dislike of them, and under circumstances that would cast the shadow of blame upon the defendant, who is not in fault to the extent of the charge made against him in her bill, if he is to be blamed at all.

We do not care to go into an examination of the money conflict between the parties. We do not consider that this is a proper proceeding to bring about an accounting between the husband and wife for the wife's separate property. The property claimed by the complainant does not relate to or grow out of the marriage relation. It was her separate estate, subject to her entire control independent of her husband. Its recovery has no congruity whatever with her action for divorce, and should have been sought in an independent suit. *Uhl v. Uhl*, 52 Cal. 250.

The only cases where third persons have been permitted to be made defendants in an action for divorce are those where such persons have conspired with the husband to transfer property subject to complainant's claim for alimony to such persons, with intent to defraud her out of her interest in such property held by reason of her marital rights in the same. *Damon v. Damon*, 28 Wis. 510; *Van Duzer v. Van Duzer*, 6 Paige, 366.

It appears that one of the two notes claimed by complainant in her original bill has been collected, and the proceeds paid over to her, and that the other note is to be collected and paid to her by stipulation between the parties. The only property controversy remaining to be settled under the

pleadings in these cases is the title to the Dakota lands. This must be litigated in an independent proceeding.

The decree of the court below in each case is affirmed, and must stand without prejudice. No costs will be awarded in this Court.

The other Justices concurred.